# 2009 DTA 79

**TRIBUNAL DE APELACIONES**
**REGIÓN JUDICIAL DE BAYAMÓN**
**PANEL VI**

TELEPHONE TECHNOLOGY SYSTEMS INC.
**Recurrente**

v.

MUNICIPIO DE BAYAMÓN; JUNTA DE SUBASTAS DEL MUNICIPIO DE BAYAMÓN; QUALITY ENERGY SOLUTION CORP.; CDS, INC.; TECHNO CONTRACTORS CORP.; MACMARTIN ENGINEERING; GROUP DE LAMAR ENGINEERING; BONNEVILLE CONSTRUCTION; DYA ELEVATOR SERVICES; BERMÚDEZ, LONGO, DÍAZ, MASSÓ SE Y WEST ELECTRIC CORP.
**Recurridos**

Núm. KLRA-09-00400

San Juan, Puerto Rico, a 15 de mayo de 2009

Panel integrado por su Presidenta, la Juez Pesante Martínez,
y los Jueces Miranda De Hostos y Morales Rodríguez

Pesante Martínez, Juez Ponente

## TEXTO COMPLETO DE LA SENTENCIA

Comparece ante nos, Telephone Technology Systems Inc. (TTS), y mediante escrito de revisión administrativa, nos solicita que revisemos la Resolución Núm. 62, Serie 2008-2009, que emitió la Junta de Subastas del Municipio de Bayamón (la Junta). Mediante la referida Resolución, la Junta adjudicó una solicitud de propuesta para el suplido e instalación de alumbrado solar en diferentes lugares del aludido municipio. Luego de examinar las propuestas presentadas por distintas compañías, incluyendo TTS, la Junta decidió aceptar la propuesta de QES, Inc., otra de las compañías licitadoras.

Inconforme, TTS acudió ante nos y planteó que erró la Junta, por haberle solicitado alegadamente de manera ilegal, a dos de las compañías participantes del proceso de solicitud, unas propuestas alternas a las que originalmente entregaron, y ello, sin que se le brindara la misma oportunidad a los demás proponentes. TTS adujo que esto es contrario al reglamento que rige estos procesos en el Municipio de Bayamón. También, señaló que erró la Junta al haber considerado la propuesta de QES, Inc., aun cuando su propuesta original no fue responsiva. Alegó que QES, Inc. no cumplió con los requisitos que se detallaron en los documentos de la solicitud de propuesta. Más aún, TTS señaló que erró la Junta al no haber adjudicado a favor de su propuesta,

aun cuando alegadamente cumplió con los requisitos que inicialmente se le pidieron, más los requisitos que finalmente fueron utilizados para adjudicar el contrato a favor de QES, Inc.

Luego de examinar los argumentos y prueba documental que ofreció TTS, junto con la comparecencia de la Junta, resolvemos. Adelantamos que confirmamos la Resolución recurrida.

# I

Esbozamos a continuación una breve relación de los hechos e incidencias procesales más relevantes del caso.

La Junta de Subastas del Municipio de Bayamón (la Junta), emitió un aviso de Solicitud de Propuestas para el suplido e instalación de alumbrado solar para diferentes lugares del municipio. Se celebró una reunión pre propuesta cuyas incidencias se pusieron por escrito en una minuta. En la referida minuta se consignó que el proceso consistiría en que los interesados someterían información de los productos objeto la solicitud de propuesta, a saber, postes solares. Las propuestas pasarían a manos de un Comité Evaluador, el cual, luego de analizar la información, presentaría una recomendación a la Junta.

Se le aclaró a las compañías que comparecieron a la reunión que el proceso **se trataba de una solicitud de propuesta y no una subasta**. Uno de los presentes cuestionó si debía incluirse en la propuesta información sobre postes o equipo de determinada altura, modelos o colores específicos, o con determinada tecnología en cuanto a iluminación. Atendiendo el reclamo, se explicó que no se les detalló cuáles productos en específico se interesaban y tampoco se impusieron condiciones, pues entonces se habría de celebrar una subasta para la adquisición de los bienes y servicios.

Se indicó que, precisamente, se escogió el proceso de solicitud de propuestas para que la evaluación estuviera abierta a todos los modelos (convencionales o modernos), estilos y tecnología disponibles que los solicitantes pudieran someter a la consideración de la Junta. Se le indicó a los presentes que los documentos de la solicitud de propuesta incluyeron unos requisitos mínimos con los cuales debían cumplir los equipos que se propusieran instalar. Se indicó que ello podía resultar en que alguien propusiera un poste en hormigón y otro en aluminio; ahora bien, uno y otro debía cumplir con los requisitos mínimos aludidos.

En el mismo ánimo de distinguir el proceso que se realizaba de uno de subasta formal, se explicó que no se iba a preparar una hoja de licitación para estipular los costos de los postes. Se comentó que cada proponente podía incluir en su propuesta varios tipos de postes, con la información de precio y garantía de cada uno.

En la Resolución recurrida se indicó que se recibieron 11 propuestas. Se explicó que se vació la información de las propuestas en una tabla de evaluación. Con la información que se recibió, el Comité Evaluador resumió las características de los equipos y productos que se incluyeron en las propuestas. Destacaron que se entendieron como aceptables, las luminarias con **tecnología SOL 3Q** (de 3228 lumens), no así los postes de la serie SOL 2Q. **Se aclaró que también eran aceptables las luminarias con tecnología (LED e Inducción) propuestas por QES, Inc.** Sobre este particular, se indicó que el Comité tomó como parámetro mínimo la serie SOL 3Q o equivalente.

En cuanto a las baterías de los postes solares, se llamó la atención al hecho de que la mayoría de los proponentes no informaron de la capacidad de las mismas en sus propuestas. No obstante, el Comité Evaluador determinó que el mínimo aceptable debía ser 120 Ah. También, se estableció como mínimo aceptable para los paneles solares de los postes uno de estilo *flat*.

Además, se expresó que en cuanto al parámetro de costo, entre los postes que cumplían con el requisito

mínimo requerido (ser de la marca SOL y con tecnología 3Q), **las propuestas de QES, Inc. y Bermúdez Longo, Díaz & Massó (BLDM) resultaron ser las más económicas**. Ahora bien, se destacó que por cuestiones de estética, hubo reparo con los postes propuestos de BLDM. El poste era de hormigón y octagonal. En cuanto a QES, Inc., el reparo fue que los postes propuestos, aunque cumplían en cuanto a la luminosidad, requerían cimientos en hormigón, lo cual no se ajustaba a los planes para dos de los lugares donde se programaba la instalación de los postes solares.

**Por ello, y tomando en cuenta que el proceso se trataba de uno de solicitud de propuestas, el Comité Evaluador invitó a BLDM y QES, Inc. a que presentaran otras alternativas de postes. Así lo hicieron las referidas compañías.** Ambas presentaron dos alternativas de postes en *fiber glass* con tecnología 3Q, uno con luminaria sencilla y el otro doble. En lo que respecta a QES, Inc., se indicó que el de luminaria sencilla se cotizaría a **$5,775**, y en caso de que se optara por hacerle cimiento en hormigón, serían $900 adicionales.

**Finalmente, el Comité Evaluador concluyó que entendía que los productos propuestos que representaban los mejores intereses del municipio fueron los propuestos por QES, Inc.** Se indicó que su propuesta era la más completa. Se destacó que todas las luminarias que presentó en sus propuestas cumplían con el requisito mínimo de iluminación. Se hizo hincapié en que **fue el único que incluyó en la propuesta los postes con panel solar doble**. Se indicó que las baterías de los productos también cumplían con el mínimo requerido.

Se reiteró que el único problema que hubo con su propuesta fue que los postes requerían cimiento en hormigón, asunto que fue subsanado luego, cuando presentó la alternativa de los **postes en *fiber glass* que se instalan con barreno y relleno compactado**. Aclaró que, comoquiera, ofreció a un costo adicional, y de así requerirlo el Municipio de Bayamón, los cimientos en hormigón. **El Comité Evaluador entendió recomendables todas las alternativas que propuso QES, Inc., incluyendo las adicionales que se le requirieron.** Llamó la atención al hecho de que esta compañía, incluso, presentó un catálogo y carta de colores para las alternativas que propuso.

Basándose en esta recomendación, la Junta decidió aceptar la propuesta de QES, Inc. Tal recomendación fue ofrecida por los miembros de la Junta, entre éstos, **arquitectos, ingenieros y directivos de la Oficina de Diseño y Construcción** del Municipio de Bayamón.

Una vez fue notificado del resultado del proceso de propuestas y adjudicación, TTS acudió ante nos. En síntesis, reclamó que su propuesta original incluyó postes que cumplían con los requisitos que finalmente tomó en cuenta el Comité Evaluador y la Junta para adjudicar la propuesta. Según se expresó, TTS incluyó un poste con tales requisitos por **$5,785**, apenas $10 más de lo que propuso QES, Inc. en su propuesta alterna.

TTS cuestionó que el Comité Evaluador sólo se comunicara con QES, Inc. y BLDM para pedirle que presentaran propuestas alternas que se ajustaran a algunos de los requisitos o criterios que establecieron luego de haber examinado las propuestas de todos los solicitantes. TTS planteó que el Comité Evaluador erró en comunicarse *ex parte* con las referidas compañías para pedirles propuestas alternas, excluyendo a las demás compañías que participaron del proceso. Sugirió que, incluso, no se debió dar esa oportunidad a QES, Inc., cuya propuesta original, entonces, debió darse por no responsiva a los requerimientos de la solicitud de propuesta en controversia.

TTS se quejó de que no se aceptara su propuesta, la cual, desde su origen, incluyó productos que cumplían con los requisitos que el Comité Evaluador terminó por considerar como mínimos. También, sugirió que a fin de cuentas, el Municipio terminaría pagando más, ya que QES, Inc. cotizó por cientos de dólares adicionales la construcción de los cimientos para instalar los postes.

Tomando en cuenta lo anterior, discutimos el derecho aplicable.

## II

De ordinario, en la adquisición competitiva de bienes y servicios por el Gobierno se utiliza el mecanismo de la subasta pública formal o tradicional (*sealed bidding*). *R & B Power, Inc. v. E.L.A.*, res. el 20 de marzo de 2007, **2007 JTS 56**. Cada entidad gubernamental promulga su propio reglamento para este particular. En términos generales, el procedimiento de subasta formal consta de varias etapas, a saber: la preparación por parte del ente gubernamental de los pliegos de condiciones y especificaciones, el aviso de subasta al público, el recibo y posterior apertura pública de las propuestas selladas recibidas, la evaluación y estudio de las mismas por un comité evaluador, la recomendación del comité respecto la adjudicación de la buena pro, la adjudicación de ésta y la notificación a todos los licitadores. *Id.*

Una vez sometidos los pliegos de licitación y abiertos éstos, los mismos **no admiten modificaciones.** La apertura de los pliegos de licitación se efectúa públicamente ante todos los licitadores. **No hay cabida en este proceso para la negociación de los términos sometidos entre agencia y licitador.** *Id.*

Por otro lado, el requerimiento de propuestas (en inglés, *request for proposals* o R.F.P.), es otro mecanismo que tiene disponible el gobierno para adquirir bienes y servicios. **Su característica sobresaliente es que admite negociación**. El requerimiento de propuestas es ante todo, un **mecanismo de compra negociada.** *Id.* Frecuentemente, se recurre a éste cuando se trata de la **adquisición de bienes o servicios especializados**, que involucran **asuntos altamente técnicos y complejos** o cuando existen escasos competidores cualificados. *Id.*

En el requerimiento de propuestas se deben enumerar los requisitos y factores que se utilizarán para la adjudicación del contrato en cuestión y a los cuales todo licitador tiene que ser responsivo. Habitualmente se le adjudica un valor o peso a los factores que se van a considerar al adjudicar la buena pro. El documento describe cómo se llevará a cabo el proceso, incluyendo el itinerario para recibir, evaluar y adjudicar la buena pro y los términos del contrato que se otorgará. Como se ha indicado, **este mecanismo admite la negociación entre el oferente y la entidad gubernamental <u>mientras</u> se evalúan las propuestas recibidas**. De ordinario, este hecho se hace constar en el documento en sí. *Id.*

Abonando a lo anterior, citando a los comentaristas, se ha destacado que distinto al proceso formal de subasta (*sealed bidding*), el requerimiento de propuestas "is a **procedure that includes the receipt of proposals from offerors, permits bargaining, and usually affords offerors an opportunity to <u>revise their offers before award of contract</u>**". *Id.* Por ello, el mecanismo de requerimiento de propuestas se destaca por su **mayor informalidad y flexibilidad**, así como por el grado de **discreción que se le confiere a la entidad pública** en la consideración de la propuesta recibida, en comparación con la subasta tradicional.

Basándonos en estos principios de derecho, concluimos lo siguiente.

## III

En este caso, no se cometieron los errores señalados. El Municipio de Bayamón estaba interesado en la adquisición de bienes y servicios altamente técnicos y especializados, a saber, la compra e instalación de postes que operen con energía solar. A esos fines, optó por tramitar la adquisición de estos bienes y servicios, no mediante el proceso de subasta formal (sealed bidding), sino por el de solicitud de propuesta (request for proposals). El Municipio, mediante su Junta de Subastas y un Comité Evaluador, cumplió con publicar un aviso y detalló una serie de requisitos mínimos con los que debía cumplir el equipo o productos que los licitadores interesados incluyeran en sus propuestas.

Valga indicar que el Municipio de Bayamón también cuenta con su Reglamento de Subastas o Solicitudes de Propuestas. Sobre este particular, TTS destacó que en el inciso (G) de la Sección 5 del Artículo VI del

referido reglamento se establece que se indicará en el aviso de subasta o solicitud de propuestas si se aceptan proposiciones alternas. También, llamó la atención a que en el inciso A (3) de la Sección 7 del referido artículo, se indica que cuando una misma empresa comercial someta varias ofertas en una misma subasta o solicitud de propuestas, a nombre propio, o de alguno o varios de sus socios, agentes u oficiales, se declararán nulas todas y cada una de dichas ofertas. Ahora bien, esa disposición añade que esa norma no impide que un licitador someta una **oferta principal y una o varias ofertas** por artículos de calidades distintas y de distintos precios, aunque **las ofertas alternas serán consideradas solamente cuando así se indique en la invitación a subasta o solicitud de propuestas, brindando a todos los licitadores la misma oportunidad.**

En relación a lo anterior, notamos que el lenguaje de este reglamento lo que implica es que, de entrada, los licitadores pueden presentar más de una propuesta, esto es, pueden someter a la consideración de la Junta una propuesta principal y unas alternas. Claro, esto está supeditado a que en el mismo aviso de solicitud de propuesta y documentación que se publique se indique que así pueden hacerlo. En el caso de que alguno de los licitadores presente más de una propuesta sin que se haga tal salvedad, no serán objeto de evaluación sus ofertas. Lo anterior, con el objeto de que no tenga ventaja sobre los demás licitadores.

Ahora bien, esto se distingue del supuesto y de los hechos de este caso. Aquí, el Municipio y la Junta fueron claros en que el proceso no era uno de subasta, sino uno de solicitud de propuesta. Se encargaron de reiterar y distinguir el proceso que se llevaría a cabo del de subasta formal. Como indicó TTS, no surge del expediente que se les hubiera advertido a los prospectivos licitadores que podían presentar varias propuestas. De hecho, de acuerdo a la prueba documental ofrecida por las partes, cada uno de los licitadores presentó en una sola propuesta, varios productos que entendían cumplían con los requisitos mínimos establecidos por la Junta.

Ahora bien, en vista de que el proceso utilizado para la adquisición de los bienes y servicios era el de solicitud de propuesta, después de que los licitadores presentaron sus propuestas originales y únicas, se abrió un proceso de negociación con los licitadores cuyos productos llenaban los requisitos exigidos inicialmente por la Junta y cuyas cotizaciones eran menores (al menos en cuanto a QES, Inc.). Dicho proceso se dio en medio del proceso de evaluación de las propuestas. Esto, precisamente, remite a la flexibilidad que le ha reconocido la jurisprudencia a este tipo de mecanismo.

La solicitud de propuesta permite que el ente gubernamental que lo promueve, pueda negociar los términos de las propuestas y permita a los proponentes revisar sus propuestas en medio del proceso de evaluación, ello, antes de conceder el contrato. En este caso, el Municipio de Bayamón, mediante la Junta y el Comité Evaluador, ejerció adecuadamente esas facultades discrecionales que le reconoce la jurisprudencia. Posteriormente, basándose en los términos y condiciones negociadas durante el proceso de evaluación, se optó por aceptar la propuesta del licitador que cotizó más bajo los equipos, a saber, QES, Inc.

En este caso, no se dio el supuesto del que advierte el reglamento del Municipio para que se anulen las propuestas originales y alternas que hubieran presentado los licitadores, y ello, por no haberse indicado tal directriz desde la publicación del aviso de solicitud de propuesta. Más bien, el Municipio de Bayamón, mediante su Junta de Subastas y Comité Evaluador, se sirvieron del mecanismo de compra negociada, flexible e informal, que representa la solicitud de propuesta. La negociación, en este caso, no está reñida con disposiciones reglamentarias ni con la jurisprudencia aplicable.

Por otro lado, advertimos que distinto a como sugirió TTS, la Junta indicó expresamente que todas las alternativas de productos que incluyó QES, Inc. en sus propuestas, cumplían con los requisitos mínimos impuestos, particularmente, el de luminosidad. Ahora bien, notamos que la tecnología que propuso inicialmente QES, Inc. (de tipo LED) era distinta a la que después se determinó que sería la que se interesaba implantar (3Q). La diferencia entre una y otra tecnología, la desconocemos. De hecho, rendimos deferencia a la determinación del Comité Evaluador, adoptada después por la Junta de Subastas, ya que tras examinar la composición de los

miembros del referido cuerpo, presumimos que éstos cuentan con el *expertise* para diferenciar lo uno de lo otro.

Lo que sí está claro es que entendieron que desde su origen, todas las alternativas que ofreció QES, Inc., se ajustaban a las necesidades del Municipio. Posteriormente, la propuesta alterna que sometió dicha compañía, tras el proceso de negociación, se ajustó aún más a los requerimientos del Municipio. Se destacó, además, que la compañía QES, Inc. presentó unas alternativas adicionales en cuanto a colores, modelos y paneles de los postes que no ofrecieron los demás licitadores. Tomando en cuenta todo ello, se adjudicó el contrato a favor de QES, Inc. y no vemos razones para variar tal determinación.

Además, distinto a como sugirió TTS, la compañía QES, Inc. fue responsiva a los requisitos de la solicitud de propuesta desde que presentó su propuesta original. Luego, con la propuesta alterna que se le solicitó como parte de la negociación, se ajustó más a las necesidades del Municipio, tanto en cuanto a los equipos como al costo de los mismos y su instalación. Por otro lado, en la propuesta original, TTS presentó dos productos que no se ajustaban a los requisitos mínimos que detalló el Comité Evaluador. Lo anterior, ya que las luminarias de los postes eran de tecnología 2Q. Otras dos opciones que presentó sí cumplían con los requisitos que eventualmente se reconocieron como mínimos, pero resultaron tener un precio mayor al que presentó QES, Inc. En el caso de QES, Inc., todas las opciones que presentó originalmente, cumplían con los requisitos iniciales. Ante los requisitos más particularizados que posteriormente se detallaron, también los productos que propuso de forma alterna, se ciñeron a lo requerido.

No es correcto tampoco aducir que el Municipio terminará pagando más por el hecho de que QES, Inc. hubiera cotizado cientos de dólares más por la construcción de los cimientos en hormigón para instalar los postes. Esto, lo incluyó QES, Inc. en la propuesta en caso de que el Municipio optara por instalar los postes con cimiento en hormigón. No obstante, tal opción parece no estar en los planes del Municipio. Precisamente, cuando se le pidió a QES, Inc. que presentara una propuesta alterna, fue para que incluyera postes que no requirieran cimiento en hormigón. Esto es, el reparo que hubo respecto a su propuesta original fue exactamente que no se requería postes con cimiento en hormigón. Tal asunto fue subsanado con los productos que incluyó QES, Inc. en la propuesta alterna, y ello, cotizándolos a un precio menor y con alternativas que se estimaron superiores a las ofrecidas por los demás licitadores. Por tal razón, se aceptó su propuesta y se determinó adjudicar el contrato a su favor. Como indicamos, no se nos acreditó razones suficientes para variar ese resultado.

## IV

En mérito de lo anterior, confirmamos el dictamen recurrido.

Lo acordó y manda el Tribunal y lo certifica la Secretaria del Tribunal de Apelaciones.

Lcda. Dimarie Alicea Lozada
Secretaria del Tribunal de Apelaciones